**PENDER PEANUT CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 616–88 C.**

United States Claims Court.

May 23, 1990.

See also 21 Cl.Ct. 95.

Evans J. Plowden, Jr., Albany, for plaintiff.

Martha DeGraff, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

Pender Peanut Corporation (plaintiff) participated in a price support program administered by the United States Department of Agriculture (USDA). Plaintiff entered into contracts with numerous farmers to buy peanuts. These contracts contained language making plaintiff subject to a monetary penalty for violation of USDA regulations.

Plaintiff did not dispose of its 1981 crop year peanuts in accordance with USDA regulations. USDA consequently assessed

a penalty of $1,165,736.75 against plaintiff in October 1982. Plaintiff now seeks damages from USDA in the United States Claims Court for levying a penalty assessment without authority. Defendant contends that plaintiff consented to the penalty by contract. Both parties move for summary judgment pursuant to RUSCC 56. This court grants plaintiff's motion for summary judgment.

## FACTS

Plaintiff is a peanut handler who purchased peanuts from growers in Georgia, Florida, and Alabama. Plaintiff processed peanuts for sale to domestic and foreign manufacturers. USDA subsidized plaintiff through a peanut price support system under the Agricultural Adjustment Act of 1938 (the 1938 Act).

### Peanut Price Support Program

Under the 1938 Act, Congress regulated peanut production with an acreage allotment system. USDA accordingly provided subsidies to farmers who agreed not to farm a certain amount of acreage. Faced with excessive production, Congress set forth in 1977 a new program based on poundage quotas. USDA accordingly provided subsidies to farmers who agreed to limit or channel production.

The 1977 amendments created two legal categories of peanuts: "quota" and "additional." Quota peanuts fall within the poundage quota set by USDA. Under the 1938 Act, handlers may sell quota peanuts for domestic consumption. Additional peanuts are the excess above a farmer's poundage quota. Handlers must export or crush additional peanuts.

The amendments regulating additional and quota peanuts provide:

(g) Upon a finding by the Secretary [of Agriculture] that the peanuts marketed from any crop for domestic edible use by a handler are larger in quantity or higher in grade or quality than the peanuts that could reasonably be produced from the quantity of peanuts having the grade, kernel content, and quality of the quota peanuts acquired by such handler from

such crop for such marketing, such handler shall be subject to a penalty equal to 120 per centum of the loan level for quota peanuts on the quantity peanuts which the Secretary determines are in excess of the quantity, grade, or quality of the peanuts that could reasonably have been produced from the peanuts so acquired.

(h) The Secretary shall require that the handling and disposal of additional peanuts be supervised by agents of the Secretary or by area marketing associations designated pursuant to section 1445c–(c) of this title. Quota and additional peanuts of like type and segregation or quality may, under regulations prescribed by the Secretary, be commingled and exchanged on a dollar value basis to facilitate warehousing, handling, and marketing.

(i) Handlers may, under regulations prescribed by the Secretary, contract with producers for the purchase of additional peanuts for crushing, export, or both. All such contracts shall be completed and submitted to the Secretary (or if designated by the Secretary, the area association) for approval prior to June 15 of the year in which the crop is produced.

7 U.S.C. § 1359 (1982). Subsection (g) sets forth the handler's obligation to market quota peanuts for domestic consumption. Subsections (h) and (i) discuss the handler's obligation to dispose of additional peanuts.

As the language of § 1359(g) indicates, Congress authorized the Secretary of Agriculture (Secretary) to impose penalties when a peanut handler failed to satisfy production quotas. Under this authority, USDA promulgated regulations for the handling of peanut crops grown between 1979 and 1981. See 7 C.F.R. §§ 1446.8 and 1446.9 (1982). Subsections (h) and (i) did not authorize similar penalties for additional peanuts.

In 1981, USDA required peanut handlers to select one of two methods of supervision to monitor the disposal of peanuts. Under the physical method, a USDA inspector observed the entire processing of a farmer's products. Under the non-physical method,

USDA authorized a state's peanut association to perform spot checks of peanut shipments. The non-physical method checked the quantity, dollar value, and screen size of additional peanuts.[1] Pender Peanut selected the non-physical method of supervision in 7 C.F.R. § 1446.10.

The Commodity Credit Corporation (CCC) determined the amount and type of peanuts that the handler must either export or crush. After CCC determination, the handlers had to furnish irrevocable letters of credit. The face value of the letter of credit had to equal the USDA penalty. If handlers failed to deliver to the association satisfactory evidence that they had exported additional peanuts, CCC extracted the penalty from the letters of credit. Handlers also were subject to penalty for failure to obtain the requisite non-physical supervision from the association. USDA, however, had discretion to reduce these penalties.

### Assessment of Penalties on Plaintiff

On October 26, 1982, USDA assessed a penalty of $1,165,736.75 against plaintiff for failure to dispose of additional peanuts in accordance with § 1359(h) and 7 C.F.R. § 1446.10. USDA determined that plaintiff did not export 4,270,098 pounds of additional peanuts.[2]

Plaintiff later submitted additional export documentation. Thus, as of December 2, 1982, USDA revised the penalty to $1,112,993.70. The reduction of the penalty reflected documentation showing that plaintiff failed to export or crush 4,076,900 pounds of peanuts instead of 4,270,098 pounds. USDA later adjusted the penalty to $1,106,638.26.

Plaintiff immediately challenged the penalty within USDA channels. On November 29, 1982, USDA, through CCC, drew on the letter of credit posted by plaintiff. This assessment in turn forced plaintiff out of the peanut handling business.

On December 22, 1982, USDA affirmed the original penalty assessment. USDA concluded, however, that plaintiff's marketing errors were unintentional. Consequently, pursuant to 7 C.F.R. § 1446.10(k)(6), USDA reduced the marketing penalty to forty percent of the basic quota price support rate for the 1981 crop, or $368,879.42. This determination exhausted plaintiff's administrative remedies.

### Claims Court Action

Plaintiff instituted this action in the United States Claims Court on October 24, 1988. Both parties have moved for summary judgment. Plaintiff contends that USDA lacked authority to assess and collect these monetary penalties. Plaintiff seeks return of $368,879.42 drawn from its letter of credit. Specifically, plaintiff contends that Congress failed to grant USDA the authority to impose penalties under the 1938 Act. Defendant responds that USDA is a third party beneficiary of the contracts between plaintiff and farmers and therefore may assess a penalty.

### DISCUSSION

#### Jurisdiction

 The Tucker Act defines the jurisdictional boundaries of the United States Claims Court:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1982). This court may not entertain claims outside the specific jurisdictional authority conferred by Congress. *Soriano v. United States*, 352 U.S.

---

1. The federal or state inspector present at the time of shipment must take a representative sample of peanuts. USDA then measures the quality and size of the peanuts in this sampling. 7 C.F.R. § 1446.10 (1982).

2. USDA assessed the penalty by multiplying the 4,270,098 pounds of "runner" peanuts by the 27.3 cent penalty rate. USDA later adjusted the penalty.

270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1956); *Tree Farm Dev. Bank v. United States,* 218 Ct.Cl. 308, 316, 585 F.2d 493, 498 (1978).

■ Here, plaintiff properly presents a money damages claim based on violations of the 1938 Act and regulations promulgated thereunder. 7 U.S.C. § 1281 (1982), and 7 C.F.R., Part 1446. Consequently, this court has jurisdiction over plaintiff's claim.

### *Summary Judgment*

■ This court may grant summary judgment, in the absence of a genuine issue of material fact, when the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Sweats Fashions v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). The court grants summary judgment to avoid unnecessary litigation and wasteful use of judicial resources. *Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984).

■ When evaluating summary judgment motions, this court must view factual

disputes from the non-movant's perspective. *Mingus Constructors v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). However, bald assertions and speculation do not create an evidentiary conflict sufficient to defeat a summary judgment motion. *Barmag,* 731 F.2d at 836.

The parties have filed cross motions. Both parties agree that no material facts are in dispute. Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Defendant's Cross–Motion for Summary Judgment, filed Dec. 19, 1989 (Def. Br.), at 4; Response of Plaintiff to Defendant's Motion for Summary Judgment, filed January 17, 1990, at 4. Thus, this court grants summary judgment in favor of the party entitled to judgment as a matter of law.

### *Review of USDA's Action Under the Administrative Procedure Act*

■ While the Administrative Procedure Act (APA) does not establish an independent basis for jurisdiction, it provides the framework for determining when and how this court may review agency action. 5 U.S.C. § 551 et seq. (1988).[3] This case is

**3.** By its terms, the judicial review provision of the Administrative Procedure Act (APA) applies "except to the extent that ... statutes preclude review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a) (1988). The Government has waived its immunity under the APA as to persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action...." 5 U.S.C. § 702. More specifically, the APA waives sovereign immunity not addressed under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982), by permitting "[a]n action in a court of the United States seeking relief other than money damages...." 5 U.S.C. § 702. Section 702 acknowledges that the Tucker Act has already waived sovereign immunity for most money damages suits. Section 702 therefore waives immunity for actions seeking relief other than money damages.

At the outset, it must be emphasized that the APA in no way changes this court's money damages jurisdiction under the Tucker Act. Section 702 explicitly states that "[n]othing herein ... confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." Consequently, the Claims Court only may follow the APA judicial review framework where plaintiffs have a money damages claim stemming from agency action and cognizable under the Tucker Act.

This construction of § 702 is consistent with existing case law which has shown the nexus between the Tucker Act and the APA. *International Eng. Co. v. Richardson,* 512 F.2d 573 (D.C.Cir.1975); *Warner v. Cox,* 487 F.2d 1301 (5th Cir.1974). In both cases, government contractors instituted money damages actions against the United States in district court. The contractors used the APA as the basis for jurisdiction because they could not satisfy the jurisdictional dollar amounts of the Tucker Act. The courts of appeals dismissed such suits on two grounds. First, the APA is not a waiver of sovereign immunity as to money damages suits. Second, the APA did not provide an independent basis for jurisdiction where the Tucker Act clearly dictated that the Court of Claims, rather than district courts, must entertain the suit. These defects are not a problem here, where parties may invoke Tucker Act jurisdiction.

As discussed *infra,* § 706 sets forth a list of standards which apply to review of various types of agency action. Except for the limitations of §§ 701 and 702 discussed above, APA places no limitations on when the Claims Court may refer to these standards for guidance.

Section 553 deals with agency rulemaking requirements. Unlike the framework of § 706 which sets forth underlying standards of review, this court will have little opportunity to hear

subject to the APA because USDA is an agency within the meaning of the APA. 5 U.S.C. § 701(b)(1) (1988); *see also,* 1 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 1.2 (2d ed. 1978). Furthermore, USDA engaged in "agency action" when it promulgated the regulations at issue. *See* 5 U.S.C. § 551(4), (13) (1988).

Under the APA, this court may set aside agency action on several independent grounds:

The reviewing court shall—

. . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706. In the case at bar, plaintiff asks this court to invalidate a penalty imposed by USDA. The gravamen of plaintiff's claim is that USDA lacks statutory authority to impose such a penalty.

Courts normally give great deference to agency determinations. The Supreme Court remarked:

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference . . . "has been consistently followed . . . whenever . . . the meaning or reach of a statute has involved reconciling conflicting policies . . . and depended upon more than ordinary knowledge. . . ."

*Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

■ This court must, however, examine carefully allegations that an agency transgressed its statutory jurisdiction. Where plaintiff alleges that agency action exceeded authority delegated by Congress, courts should accord only limited deference to an agency's interpretation of a statute. 5 U.S.C. § 706(1) (*de novo* review of questions of law); *see also, Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 365, 106 S.Ct. 681, 684, 88 L.Ed.2d 691 (1986); *Office of Comm'r of United Church of Christ v. F.C.C.,* 707 F.2d 1413, 1422 (D.C. Cir.1983). The United States Court of Appeals for the District of Columbia Circuit reasoned:

To do otherwise would risk diluting the judiciary's power to stand guard against bureaucratic excesses by ensuring that administrative agencies remain within the bounds of their delegated authority.

challenges brought under § 553. In the first place, challenges to rulemaking typically involve requests for injunctive relief, such as ordering an agency to conduct new notice and comment proceedings. Second, § 553 excludes much of this court's business, including matters "relating to . . . public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). Further, the APA sections dealing with procedures for agency adjudication typically will be beyond this court's reach because parties typically ask for injunctive rather than monetary relief.

In sum, then, the APA principally arises in the Claims Court when there is some question about when and under what standards this court may

review agency action which gives rise to a money damages claim. While this is a limited application, the APA nevertheless can play a vital role in supplying a uniform, structured, and methodological approach to reviewing agency actions. In over 50 opinions, the Claims Court or its predecessor, the Court of Claims, have invoked the APA standards for this purpose. *See e.g., Wathen v. United States,* 208 Ct.Cl. 342, 527 F.2d 1191 (1975); *McGrath v. United States,* 207 Ct.Cl. 978, 978, 521 F.2d 1406 (1975); *Hedman v. United States,* 15 Cl.Ct. 304 (1988); *S & G Excavating v. United States,* 15 Cl.Ct. 157 (1988); *Texas State Comm'n for the Blind v. United States,* 6 Cl.Ct. 730 (1984), *rev'd on other grounds,* 796 F.2d 400 (Fed.Cir.1986).

Indeed, it is the quintessential function of the reviewing court to interpret legislative delegations of power and to strike down those agency actions that traverse the limits of statutory authority.

*United Church of Christ*, 707 F.2d at 1422–23 (footnotes omitted).

■ Where agency action oversteps the bounds defined by law, the court must not unduly defer to the agency. The Supreme Court observed:

Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate a congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions.

*NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). The starting point for determining the parameters of agency authority is the language of the enabling statute itself. *Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

*Statutory Authorization to Assess Penalties*

A statute must plainly authorize an agency's power to impose penalties:

In an action like the present, brought to recover that which is substantially a statutory penalty, the statute must receive a strict, that is a literal construction. The defendant is not to be subjected to a penalty unless the words of the statute plainly impose it.

*Tiffany v. National Bank of Missouri*, 85 U.S. (18 Wall.) 409, 410, 21 L.Ed. 862 (1874).

The Supreme Court has reaffirmed this position:

We are here concerned with a taxing act which imposes a penalty. The law is settled that "penal statutes are to be construed strictly" ... and that one is not to be subjected to a penalty unless the words of the statute plainly impose it. ...

*Commissioner v. Acker*, 361 U.S. 87, 91, 80 S.Ct. 144, 147, 4 L.Ed.2d 127 (1959) (citations omitted).

Consistent with the Supreme Court's mandate, the Claims Court carefully construes language which imposes a penalty:

It is a venerable rule of statutory interpretation that a statute imposing a penalty "must receive a strict, that is, a literal construction."

*Berkshire Hathaway, Inc. v. United States*, 8 Cl.Ct. 780, 784 (1985) (citations omitted), *aff'd*, 802 F.2d 429, 431 n. 6 (Fed. Cir.1986). Thus, to prevail on its motion, defendant must show that Congress granted USDA explicit statutory authority to promulgate regulations providing for the assessment of penalties.

■ Congress set forth penalties in subsection (g), which deals with quota peanuts:

Upon a finding by the Secretary ... such handler shall be subject to a penalty equal to 120 per centum of the loan level[.]

7 U.S.C. § 1359(g) (1982). Congress did not, however, expressly provide penalties for violation of 7 U.S.C. § 1359(h). USDA nevertheless assessed the penalty against plaintiff for violation of § 1359(h). Thus, while Congress could have set forth a penalty for additional, as well as quota, peanuts, it did not do so.

USDA attempted to supply a penalty for subsection (h) not found in the law. Defendant argues that, absent clear error, this court should defer to USDA's interpretation of the 1938 Act. In support of this proposition, defendant cites *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). *Mourning* suggests that a court should sustain agency action taken pursuant to a broad delegation of authority if such action is reasonably related to the purposes of the enabling act. *Id.*

In *Mourning*, a taxpayer challenged regulations established by the Federal Reserve Board (FRB) to implement the Truth in Lending Act. The Supreme Court allowed

assessment of a penalty because Congress had expressly authorized FRB to establish penalties under the provision at issue.[4]

Here, however, Congress did not authorize USDA to establish penalties under § 1359(h). Plaintiff violated a regulation promulgated pursuant to subsections (h) and (i) of § 1359. Subsections (h) and (i) are distinct from subsection (g), which does permit assessment of penalties. While subsection (g) contains specific congressional authorization for imposing penalties, subsections (h) and (i) contain no such similar authorization. Defendant urges this court to extend the civil penalty authorization in one subsection to all subsections. Yet, Congress placed the penalty provision in subsection (g) only. The 1938 Act applies the penalty only to subsection (g). USDA clearly acted inconsistent with this statutory language. Thus, *Mourning* does not require this court to defer to USDA's penalty assessment.

Although not governed by *Mourning*, this case fits well within the Eleventh Circuit's reasoning in *Gold Kist, Inc. v. United States Dept. of Agric.*, 741 F.2d 344 (11th Cir.1984). In *Gold Kist*, USDA charged a peanut handler with a technical violation of §§ 1359(h) and (i). Gold Kist did not obtain prior permission for an otherwise valid peanut disposal plan. USDA assessed a monetary penalty. The Eleventh Circuit held that USDA lacked the authority to impose monetary penalties against Gold Kist:

Of the three subsections of section 1359 added in 1977 only subsection (g) specifically provides for a marketing penalty.

. . . .

[W]e hold that the statute must plainly establish a penal sanction in order for the agency to have authority to impose a penalty. . . . We conclude the fines imposed on Gold Kist were penalties. . . .

. . . .

We therefore reverse the district court's finding that USDA possessed inherent authority to impose the marketing penalties at issue here.

*Gold Kist*, 741 F.2d at 347–49.

Defendant tries to distinguish *Gold Kist* from the case at bar.[5] These distinctions, however, do not confer on USDA legal authority which the Eleventh Circuit concluded that USDA lacked. While Gold Kist and plaintiff committed different violations, both violated regulations promulgated under the same paragraph of the Act—subsection (h). Both cases therefore address the same legal issue—the authority of USDA in the context of additional peanuts. As previously discussed, Congress did not authorize penalties in subsections (h) and (i). Thus, this court also concludes that USDA lacked the "inherent authority to impose the marketing penalties at issue here." *Gold Kist*, 741 F.2d at 349.

Congress did not envision delegating penalty powers to USDA under §§ 1359(h) and (i) until 1982. Congress amended § 1359 in 1981 to provide penalties for subsection (h). The effective date for this amendment was 1982. Beginning in 1982, then, Congress expressly conferred author-

---

**4.** The Truth in Lending Act stated:

§ 130. Civil Liability

(a) Except as otherwise provided in this section, any creditor who fails in connection with any consumer credit transaction to disclose to any person any information *required under this part* [chapter] to be disclosed to that person is liable to that person in an amount equal to the sum of

(1) twice the amount of the finance charge in connection with the transaction, except that the liability under this paragraph shall not be less than $100 or greater than $1,000. . . .

15 U.S.C. § 1640 (1976) (emphasis added). This language created a civil penalty for failure to disclose information specified by any provision in chapter two (§§ 121–130). Consequently, the Federal Reserve Board (FRB) had authority to assess a penalty under § 128, the provision at issue.

**5.** Defendant tried to distinguish this case from the Eleventh Circuit case as follows: First, unlike plaintiff, Gold Kist accounted for all of the peanuts it marketed. Second, while USDA charged Gold Kist with a technical violation, plaintiff committed a material violation—failure to export or crush the requisite amount of additional peanuts. Defendant notes that USDA could not have granted plaintiff permission to export or crush fewer pounds.

ity on USDA to impose penalties for failure to export or crush additional peanuts.

If §§ 1359(h) and (i) gave USDA power to assess penalties in 1981 as defendant claims, then Congress would have had no need to enact an amendment specifically conferring such authority. Thus, Congress's enactment of penalty authority in 1981 underscores congressional understanding that USDA lacked that power during the year at issue in this case.

Defendant nevertheless alleges that this court should uphold the penalty because plaintiff had notice of potential liability. 7 C.F.R. § 1446.10(k)(6) sets forth the penalty and plaintiff knew of this regulation prior to signing the contracts. USDA, however, may only impose expressly authorized penalties. This regulation "must therefore be regarded 'as no more than an attempted addition to the statute of something which is not there.'" *Acker*, 361 U.S. at 94, 80 S.Ct. at 148 (citations omitted). Consequently, USDA lacked statutory authority to impose civil penalties against plaintiff.

In support of its position, defendant similarly argues that plaintiff agreed to be bound by the marketing penalty. The parties' agreement stated in pertinent part:

> I agree that I will either export or crush the peanuts delivered under this contract ... and that, upon my failure to do so, I shall be subject to a marketing quota penalty....

7 C.F.R. § 1446.5(a)(9). USDA's regulation required each peanut contract to contain this language purporting to impose a penalty not authorized by law.[6]

This contractual provision may not supply a penalty which the law does not authorize USDA to exact. If the court enforced this provision USDA could circumvent the Supreme Court's clear pronouncement that one "is not to be subjected to a penalty unless the words of the statute plainly impose it." *Acker*, 361 U.S. at 91, 80 S.Ct. at 147. The statute did not contain a penalty for violation of the additional peanut rules. *Gold Kist*, 741 F.2d at 347–49. Therefore, USDA may not create a penalty by regula-

tion. Under the standard set forth in 5 U.S.C. § 706(2)(C), this regulation exceeds the authority granted to USDA by statute. In this instance, the regulation incorporated the penalty into peanut contracts as well. Nonetheless, USDA lacked power to create a regulatory penalty not found in the law.

This court understands, however, that USDA may have ensured compliance with the additional peanut regulations without the use of penalties. Congress required the Secretary to oversee disposal of additional peanuts. 7 U.S.C. § 1359(h). The Secretary and his agents had power to carry out these commands of law. That authority, however, did not include the power to impose penal sanctions. The Secretary was still free to use any non-penal devices to execute the law.

Even if defendant argued that the parties impliedly intended to benefit USDA by executing a handler's agreement in accordance with applicable regulations, the court still could not enforce the penalty. As previously discussed, USDA lacked authority to impose the penalty by regulation or otherwise.

## CONCLUSION

USDA lacked explicit statutory authority to impose monetary penalties for mishandling additional peanuts in 1981 under 7 U.S.C. §§ 1359(h) and (i). Up until 1982, Congress only conferred authority on USDA to assess penalties as to quota peanuts under § 1359(g). Consequently, USDA improperly levied a penalty on plaintiff for violation of subsections (h) and (i). This court therefore grants plaintiff's motion for summary judgment and denies defendant's cross motion for summary judgment. The parties shall submit a judgment amount to this court on or before June 14, 1990, at which time the Clerk is directed to enter judgment without further order.

No costs.

---

6. No copy of an actual contract (Form CCC–1005) between Pender Peanut and a grower was part of the record. 7 C.F.R. § 1446, however, required this clause in each contract.