The **TOWN OF FALLSBURG, Plaintiff,**

v.

The. **UNITED STATES, Defendant.**

No. 381–89L.

United States Claims Court.

March 8, 1991.

Daniel Riesel, New York City, for plaintiff. Lawrence R. Sandak and Karen E. Gross, New York City, of counsel.

Carl Strass, with whom was Acting Asst. Atty. Gen. Richard B. Stewart, Washington, D.C., for defendant. E. Donald Elliott, Howard F. Corcoran, Jonathan S. Cole, and Meyer Scolnick, U.S. E.P.A., of counsel.

## OPINION

BRUGGINK, Judge.

This case is before the court on the parties' cross-motions for summary judgment. Plaintiff, Town of Fallsburg, New York, alleges that a Regional Administrator of the United States Environmental Protection Agency ("EPA") abused his discretion by withholding Clean Water Act ("CWA")[1] grant funding due to the Town. Defendant counters that the Town's failure to prevent the involvement of the Town Supervisor, who had a declared conflict of interest, from participating in the procurement, preparation or performance of a subagreement was sufficient grounds to withhold funds. The issues have been fully briefed and orally argued. For the following reasons, EPA's decision is sustained. The Town's motion for summary judgment is denied, and defendant's motion is granted.

## FACTUAL BACKGROUND

This action seeks the reinstatement or restitution of federal grant funding which had been awarded to the Town for the construction of a wastewater collection and conveyance system to upgrade the existing sewage plant. The Town alleges in its complaint that EPA arbitrarily and capriciously withheld grant funding due pursuant to the grant award. Defendant counters that sanctions were justified due to the Town's failure to establish and maintain effective safeguards to prohibit employees with conflicts of interest from engaging in fraud and corruption and from participating in the procurement and performance of a subagreement the Town entered into pursuant to the grant.

The following facts are drawn from the administrative record. On September 30, 1981, EPA awarded to the Town Federal Construction Grant No. C-36-942-03 for construction of a wastewater collection and conveyance system to upgrade the existing plant ("Project"). The federal allowable Project cost was determined to be $21,203,-927, with the federal share being 75 percent of the allowable costs, or $15,902,945. The award of the EPA grant represented the culmination of approximately 40 years of effort to bring sewage treatment to the Town.

The grant contemplated separate contracts by the Town for portions of the work. Contract 1-E, at issue here, was an equipment supply contract in the amount of $570,000 for the purchase of equipment and tools to maintain the sewage treatment facilities. The federal share of Contract 1-E was $244,103.

The Town retained Camp, Dresser & McKee ("CDM") as consultants in connection with the EPA grant. CDM prepared bid specifications for the Project, including Contract 1-E. The specifications were subsequently submitted to the New York State Department of Environmental Conservation ("DEC"), which supervised grant awards and contract performance pursuant to 40 C.F.R. § 35.912 (1981).[2] DEC re-

---

1. As amended, 33 U.S.C. §§ 1251-1376 (1988).

2. Plaintiff's claim is governed by the relevant provisions of Title 40 of the Code of Federal

viewed the specifications and approved them on May 20, 1982. Three different bidders obtained copies of the specifications for Contract 1–E.

Contract specifications required that the successful bidder procure and deliver to the Town certain equipment, including a sewer cleaner, a backhoe and a sludge truck, as well as small tools to be used in operating the treatment system. The specifications also required that the successful bidder store and maintain the tools and equipment in a bonded warehouse located within 30 miles of the construction site until the Project was completed. This provision was inserted· by CDM.

At the time of the grant and throughout the bidding and eventual award of Contract 1–E, the Town was administered by a Town Board and one full time elected official, Brian Ingber, who held the office of Town Supervisor. In that capacity, he served as Project Manager for the Project.

Ingber had been elected Town Supervisor in 1977. Since that time and throughout the formation of Contract 1–E, Ingber was, in addition to being the Town Supervisor, the Secretary–Treasurer of Service Scaffold, Inc., a local business. Ingber had no ownership interest in Service Scaffold but received a salary of $100 per week, and was included in the company's employee's retirement system. Ingber's father, Mack Ingber, was president, and his brother, Howard Ingber, was vice-president. These two individuals were the sole shareholders.

The Town and Service Scaffold had unspecified dealings prior to Contract 1–E that were not related to the grant. Because of those dealings, Ingber sought an opinion from the State Department of Audit and Control, at the time of his election to Town Supervisor regarding his apparent conflict of interest. Ingber included an opinion letter from the Sullivan County Attorney, William C. Rosen, in his request. Rosen stated that Ingber "receives a nominal salary in order to qualify him for certain corporate benefits such as its pension"

and that "he would not be involved in any way with the procurement, preparation or performance of any future contract and that his remuneration from the corporation will not be directly affected as a result of any such contract." The value of Ingber's pension and other corporate benefits was not given.

The New York State Comptroller ruled on January 3, 1978 that, based on Rosen's letter, Ingber would have a statutory interest in any contracts between Service Scaffold and the County. Nevertheless, under state law that statutory interest was not prohibited if Ingber's remuneration as an officer and employee of Service Scaffold was not directly affected as a result of such contracts, and if the duties of such employment did not directly involve the procurement, preparation or performance of any part of Service Scaffold's contracts with the County. See N.Y.Gen.Mun.Law §§ 801, 802. The Comptroller stated:

> [T]he question of whether a municipal officer's duties with a private corporation directly involve the procurement, preparation or performance of any part of the corporation's contract with the municipality is, in each instance, a question of fact which must be determined at the local level. We do not make such determinations and are simply accepting your declarations at face value.

In May 1978, Ingber filed a Disclosure Statement with the Town Board in which he described his connection to Service Scaffold as "minor and [that it] in no way reflects on my municipal functions for this town." The Town resolved, at that time, to arrange its dealings so that Ingber would not vote on matters pertaining to Service Scaffold and would not be responsible for approving payments to the company. In his Disclosure Statements to the Sullivan County Board of Supervisors dated January 1980 and January 1981 Ingber stated that he did not participate directly or indirectly in the procurement, preparation or

Regulations ("CFR") codified in 1981. All references to the CFR will be to the 1981 codification

unless otherwise noted.

performance of any contract between Service Scaffold and the County.

The Town applied for the EPA grant in August 1981. Among the assurances in the application was the following: "[The grantee] will establish safeguards to prohibit employees from using their positions for a purpose that is or gives the appearance of being motivated by desire for private gain for themselves or others, particularly those with whom they have family, business or other ties." Based on the Town's application, as certified and signed by Ingber, EPA agreed to assist the Town in financing the Project. As authorized representative for the Project, Ingber signed the assistance agreement form on October 29, 1981, which included a promise to comply with applicable EPA regulations.

The bid submission date for Contract 1-E was set for June 21, 1982. The specifications were made available to prospective bidders by May 21, 1982. Addenda in the nature of changes to the bid specifications were sent out on June 12 or 13 and an additional addendum was sent out June 17. Nevertheless, Ingber refused to accept the suggestion of a CDM engineer that the bid date be postponed.

Three separate supplier quotations for the sewer cleaner, the sludge truck, and the backhoe were prepared by the Town for potential bidders. These quotations were furnished in order to facilitate the bidding process. The bidders were not required by Contract 1-E specifications to use any specific supplier or to utilize the furnished prices. At least two bidders attempted to verify the price quotations. What was not disclosed to the bidders was that the price quotations for the sewer cleaner and the sludge truck included two additional pieces of equipment not called for in the specifications. Ingber contacted the Ralph C. Herman Company, which deals in construction equipment, and requested that the company include the price of an extra replacement hopper designed to fit the Town's street cleaner within the price for the sewer cleaner. The price furnished by the company contained an additional $12,000 to cover the cost of the extra hopper. Howard Ingber or some other Town representative also requested that the quotation for the sludge truck, received from a local garage, include the cost of a pick-up truck. The price furnished by the garage included an additional $12,085 for the truck. It is not clear from the record what Ingber or Service Scaffold intended to achieve by these activities.

Unbeknownst to the Town or DEC, after the bidding process was over and Service Scaffold had submitted its bid on Contract 1-E, Ingber executed an indemnification agreement in his corporate and personal capacities on Service Scaffold's behalf. Service Scaffold needed the indemnification in order to qualify for the contract award. On August 3, 1982, with Ingber excusing himself, the Town Board voted to award Contract 1-E to the low overall bidder, Service Scaffold. On August 27, 1982, DEC sent the Town a list of equipment that would be eligible for grant funding, including three items of heavy equipment and miscellaneous tools. The letter does not mention the additional equipment.

After Service Scaffold won the bid, Ingber submitted his personal disclosure statements, including one he had prepared on May 31, 1982, along with an opinion letter of the Town Attorney to DEC. Based on Ingber's submissions and assurances, and unaware that Ingber had executed an indemnification on behalf of Service Scaffold, DEC mailed an "authority to award" letter to the Town.

The Town formally awarded Contract 1-E to Service Scaffold on October 13, 1982. Although Service Scaffold presented the overall low bid, the portion of Service Scaffold's bid that was allotted to equipment costs was higher than that allotted by the other two bidders. Service Scaffold was able to present the overall low bid because it could easily modify and enlarge its existing warehouse to satisfy the warehousing specification, whereas the other bidders would have been required to rent temporary storage space.

Project specifications required all contractors to submit their bills to CDM for approval. CDM, after verifying that the

contractors had satisfactorily completed the work, would send the approved bills to the Town for payment. When contractors sent bills directly to the Town, a Town employee was instructed to send them to CDM for approval. At the time the Board awarded Contract 1–E to Service Scaffold, it designated one of its members, Joseph LaRuffa, to sign all vouchers for payment after their receipt from CDM so that Ingber would not be responsible for approving payments to Service Scaffold. The Town, nonetheless, paid Service Scaffold on vouchers that CDM had not first approved. This was done by Patricia Davis, Ingber's Administrative Assistant, at Ingber's request. LaRuffa later signed and approved the payment vouchers to Service Scaffold after payment had already been made.

Following the award of Contract 1–E, Ingber caused several payments to Service Scaffold to be accelerated and had Town administrative personnel present vouchers to LaRuffa for his signature. As the administrative record reveals, the accelerated payments were arranged at a meeting between Ingber, Davis, and CDM engineers on December 22, 1982. At the meeting, Ingber dictated a letter for Davis' signature, requesting immediate delivery of all items under Contract 1–E "due to the complexity of the installation of the sewer lines, pump station and sewer plant." The letter was backdated to October 28, 1982.

Service Scaffold acquired all the equipment and tools specified in Contract 1–E. Service Scaffold also stored the equipment in its bonded warehouse, and thereafter distributed the equipment to the Town. The sewage treatment system was essentially completed in the summer of 1986 and was operational by November 1986.

EPA's Regional Administrator for Region II ("RA") notified the Town by letter dated February 4, 1983 that pursuant to 40 C.F.R. § 35.615–3, EPA was instructing DEC to withhold payment on requests for reimbursement of the federal share of any expenses under Contract 1–E pending an investigation of the allegation that the Town was not in "compliance with the conditions of the grant award." Two EPA internal memoranda, dated July 19, 1982 and January 10, 1983, indicate that EPA was concerned about a possible conflict of interest and was investigating the propriety of bidding procedures and specifications. EPA's inquiry into Ingber's possible conflict of interest was stayed, however, pending a criminal investigation of Ingber by the Department of Justice in connection with Contract 1–E as well as certain other unrelated activities.

The criminal investigation resulted in an indictment on August 23, 1985 in the United States District Court for the Southern District of New York against Brian Ingber, Service Scaffold, and others based, *inter alia*, on acts involving Contract 1–E.[3] After a non-jury trial, Ingber was found guilty of mail fraud and making false and fraudulent statements. The court made the following findings. Ingber misled DEC and EPA concerning the true nature of his role at Service Scaffold and his involvement with Contract 1–E. Ingber falsely and fraudulently represented that he had only a nominal interest in Service Scaffold and would not participate and had not participated in the administration of Contract 1–E. Ingber did not curtail his role as Project Manager. Ingber showed a special interest in advancing Service Scaffold's interests concerning Contract 1–E. Ingber's signature on the indemnification agreement, made at the same time he was assuring DEC that he was not involved in the "procurement, preparation or performance" of Contract 1–E, constituted fraud. DEC would not have mailed the authority to award letter if it had known of Ingber's role in the indemnification. Ingber approved and accelerated payments to Service Scaffold. Ingber advanced payments to Service Scaffold after EPA began its investigation. DEC would have withdrawn funding if it had known of Ingber's involve-

---

**3.** A separate count charging Brian Ingber with mail fraud in connection with his reelection as Town Supervisor was severed and tried to a jury. Ingber was convicted. Charges tried to the court were brought under the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1962 (1988), and for the crime of making false statements, 18 U.S.C. § 1001.

ment in the approval of payments or the acceleration of payments to Service Scaffold. Ingber's association with Service Scaffold was well known to everyone on the Board. The Town furnished "deceptive" figures to perspective bidders. LaRuffa's role in approving vouchers was an "empty formality."

The court held that Ingber committed mail fraud in connection with his execution of the bonding instrument on behalf of Service Scaffold and fraudulently arranged for the acceleration of payments to Service Scaffold without good cause. The court drew no inference of criminal intent from Ingber's action of conveying misleading price quotations to prospective bidders.

During the sentencing proceeding, Judge Brieant ordered Service Scaffold to make restitution to the Town and Ingber to make further restitution for any amount not provided by Service Scaffold. He concluded that the Town had been "victimized" by Ingber's activities and should be recompensed for the losses it incurred. In relation to the accelerated payments for equipment during installation, Judge Brieant noted, "[n]one of the equipment [so requested] was in fact related to the installation of any aspect of the Sewer Project.... The entire arrangement involving this backdated letter was a mere sham or pretense to lend an appearance of propriety to advance payments made, and to be made, to Service Scaffold." The Judge also said, "I do not see any legal or moral reason why the Town should lose its state and federal aid for the value of any necessary items actually furnished to the sewer project." Judge Brieant ordered restitution for only those losses incurred by the Town which reflected any of Service Scaffold's improper gains, as would be subsequently determined.

By a Disputes Decision Official's letter dated March 12, 1987, EPA Region II denied grant funding for Contract 1–E pursuant to 40 C.F.R. § 35.965, stating that the Town, as grantee, failed to comply with the provisions of 40 C.F.R. §§ 33.123 and 35.-936–13 (Nonrestrictive Specifications), 30.-340–2 (Standards for Applicants), and 33.-

300 (Grantee Responsibility for Standards of Conduct). The Town appealed that decision to the RA by letter dated March 27, 1987.

The RA affirmed the Disputes Decision Official's decision on July 8, 1988. After considering the range of sanctions available under 40 C.F.R. § 30.430, the RA disallowed Project costs directly related to noncompliance with 40 C.F.R. § 30.210 (Role of the Grantee) and 40 C.F.R. § 33.300 (Grantee Responsibility). The RA cited the Town's failure to take effective action to prevent Ingber from being involved in "the procurement, preparation or performance of Contract 1–E" although the Town was aware of the relationship between its Supervisor and Service Scaffold. While noting that the Town had excused Ingber from voting on matters pertaining to Contract 1–E and had relieved Ingber of responsibility for approving payments to the company, the RA observed, "[T]he Board apparently made no effort to see that these authorizations were actually and effectively implemented, nor did it take any other steps to effectively isolate Brain Ingber from the Service Scaffold, Inc. contract."

Relying in part on the Findings and Conclusions of Judge Brieant, the RA found that everyone on the Board knew of Ingber's association with Service Scaffold; that Ingber falsely characterized his involvement with Service Scaffold as being minor and not in conflict with his municipal duties; that Ingber had been involved in the issuance of the addenda and had obtained price quotations that he later caused to be sent to bidders; that Ingber had signed an indemnification agreement which was not disclosed to the Town or DEC; that Ingber did not curtail his role as Project Manager with respect to Contract 1–E; that LaRuffa's role in approving the vouchers from Service Scaffold was an "empty formality"; and that Ingber had made a special effort to insure accelerated payments and to cover up the payments by a backdated letter. The RA concluded:

It is evident that the Town Board's failure to prevent Brian Ingber from ac-

tually being involved in the "procurement, preparation or performance" of Contract 1–E demonstrated a significant degree of negligence or indifference. This is hardly the exercise of the degree of fiduciary care prescribed by 40 C.F.R. § 30.210 and expected of a trustee of grant funds.

In view of the Town's failure to take effective action to prevent either the appearance or the actuality of favoritism in awarding and administration of Contract 1–E, the situation clearly calls for sanctions to uphold the integrity of the procurement process and to restore public faith in its fair and impartial administration.

The Town filed a "petition for discretionary review" with the Assistant Administrator for Water at EPA headquarters. 40 C.F.R. § 30.1225 (1984). The petition was denied by letter dated June 28, 1989, and the Town then filed this action.

## DISCUSSION

I. Statutory and Regulatory Framework

Title II of the CWA, 33 U.S.C. §§ 1281–1299, establishes a grant program for the construction of publicly-owned wastewater treatment works. The program authorizes federal financial assistance for all phases of the construction process, from preliminary planning to physical construction. Section 1281(g)(1), authorizes EPA to make grants to state and local governmental agencies for the construction of publicly-owned treatment works, subject to the limitations and conditions set forth in section 1284.

Congress recognized that funding for such projects would be limited. In its statement of policy, Congress stated that all wastewater treatment construction grant projects should be "the most economical and cost-effective combination of [treatment works]." 33 U.S.C. § 1298(a). As this court recognized in *City of Wheeling, W. Virginia v. United States*, 20

Cl.Ct. 659, 666 (1990) (quoting 33 U.S.C. § 1251(f)), "Under the CWA, EPA's authority to award grants is subject to compliance with the general goals and policies including application of its provisions so as to make the 'best use of available manpower and funds.'"

To further the goals set forth by Congress, EPA has adopted detailed regulations governing the award and administration of construction grant assistance.[4] These regulations state that the award of EPA grant funds constitutes a public trust, 40 C.F.R. § 30.210, and that the "grantee bears the primary responsibility for the prevention, detection and cooperation in the prosecution of any [fraud or other corrupt practices]," 40 C.F.R. § 30.245. A grantee may not delegate or transfer its responsibility for the use of grant funds. 40 C.F.R. § 30.700(b).

Under the regulations, "[t]he grantee must maintain standards of conduct which shall govern the performance of its officers, employees, or agents in the conduct of project work, including procurement and the expending of project funds." Those standards prohibit a grantee's officers employees or agents from accepting anything of monetary value from contractors, and require that the grantee avoid "personal or organizational conflicts of interest or noncompetitive procurement practices." 40 C.F.R. § 33.300; *see* 40 C.F.R. § 30.420–4. The grantee may use its own procurement systems and procedures which meet state or local laws, but only to the extent those systems and procedures do not conflict with the minimum requirements set forth in applicable EPA regulations. 40 C.F.R. § 33.100. The grantee is responsible for maintaining a financial management system which shall provide for: "(c) Effective control over and accountability for project funds, property and other assets. Grantees shall adequately safeguard all such assets and shall assure that they are used solely for authorized projects." 40 C.F.R. § 30.800. The regulations also provide

---

**4.** 40 C.F.R. Parts 30 (General Grant Regulations and Procedures), 33 (Subagreements), 35 (State and Local Assistance).

that grant payments may be withheld after written notice to the grantee if a grantee fails to comply with grant award conditions. 40 C.F.R. § 30.615–3(a).

The regulations specify procedures for resolving disputes by an EPA Disputes Decision Official and for seeking review of that decision by the RA and by EPA headquarters officials. *See* 40 C.F.R. §§ 30.-1200–30.1235.[5] If the RA determines that the grantee has failed to comply with the regulations, the following sanctions may be imposed:

(a) The grant may be terminated or annulled ...;

(b) Project costs directly related to the noncompliance may be disallowed;

(c) Payment otherwise due to the grantee may be withheld ...;

(d) Project work may be suspended ...;

(e) A noncomplying grantee may be found nonresponsible or ineligible for future Federal assistance or a noncomplying contractor may be found nonresponsible or ineligible for approval for future contract award under EPA grants;

(f) An injunction may be entered or other equitable relief afforded by a court of appropriate jurisdiction;

(g) Such other administrative or judicial action may be instituted if it is legally available and appropriate.

40 C.F.R. § 30.430 (Noncompliance with General Grant Regulations and Procedures); *see* 40 C.F.R. § 35.965 (Enforcement of regulations pertaining to Grants for Construction of Treatment Works).

## II. Standard of Review

The parties are in dispute as to the scope of this court's review of the RA's decision to withhold grant funding. Defendant contends that the RA's decision is subject to limited review, consistent with that contemplated by the Administrative Procedure Act ("APA"),[6] and thus, will be overturned only if the agency exceeded its statutory authority, or if its decision was not based on substantial evidence or was arbitrary, capricious or an abuse of discretion. Although the Town uses such terminology in its complaint, in its briefing on the cross-motions for summary judgment, the Town contends that EPA's determination to withhold funding under Contract 1–E is subject to *de novo* review, in the same way applicable to any breach of contract suit. It relies primarily on this court's decision in *County of Suffolk, New York v. United States*, 19 Cl.Ct. 295, 299 (1990).

There is no question that the grant application and approval process together make up all the elements of an agreement.[7] *See Bennett v. New Jersey*, 470 U.S. 632, 638–39, 105 S.Ct. 1555, 1559, 84 L.Ed.2d 572 (1985). As the Supreme Court has taught, however, it is unrealistic to say that the formation and nature of that agreement is not unique in ways relevant to determining the scope of judicial review. In *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985), the Court held that while a grant-in-aid program administered by the Department of Education "had a contractual aspect," the program could "not be viewed in the same manner as a bilateral contract governing a discrete transaction." *Id.* at 669, 105 S.Ct. at 1552. It explained that "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Id.; see also Missouri Health & Medical Org., Inc. v. United States*, 226 Ct.Cl. 274, 278, 641 F.2d 870, 873 (1981) (suggests that grants are not "traditional, formal contracts").

---

**5.** The regulations codified at 40 C.F.R. §§ 30.-1200–30.1235 apply to all assistance disputes filed after October 31, 1983. 48 Fed.Reg. 45,-056, 45,060 (1983).

**6.** 5 U.S.C. §§ 701–706 (1988). The APA does not have direct application to this court, nevertheless APA standards play a "vital role in supplying a uniform, structured, and methodological approach to reviewing agency actions." *Pender*

**7.** Approval by the Administrator of EPA of a grant application is deemed to constitute a "contractual obligation of the United States for the payment of its proportional contribution to such project." 33 U.S.C. § 1283(a).

Grants under the CWA manifest this same hybrid character. Congress began a legislative initiative to improve water quality by use of financial incentives to local governments. A finite sum of money is made accessible, subject to stringent, unilaterally imposed restrictions. By applying for and accepting federal monies, the municipality agrees to abide by pre-existing statutes and regulations. "[T]he State agreed to comply with, and its liability is determined by, the legal requirements in place when the grants were made." *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. at 670, 105 S.Ct. at 1552.

■ Part of the regulations incorporated into the agreement address what happens if the parties have a dispute. The Town agreed to be bound by regulations that set up dispute-resolution procedures and remedies. 40 C.F.R. § 30.615-3(a) specifically contemplates that grant payments may be withheld if a grantee fails to comply with grant award conditions. The Town also agreed that the determination of whether there had been noncompliance could be made by the RA, and that one of the RA's options would be to disallow costs related to the noncompliance. The agreement entered into by the Town thus grants discretion to the RA to impose the penalty levied in this action. Viewing the parties relationship as contractual, therefore, *cf. County of Suffolk*, 19 Cl.Ct. at 296, does not compel *de novo* review. Rather, it is consistent with the parties' bargain to review the administrator's actions only for abuse of discretion granted by the terms of the agreement. *See Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1055 (Fed. Cir.), *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983).

The court's role is not to determine anew whether there has been noncompliance or what the penalty should be. Under the arbitrary and capricious standard, a reviewing court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d

136 (1971) (citations omitted) (where court reviewed federal agency's decision under the APA). In *Bennett v. New Jersey*, 470 U.S. at 633, 105 S.Ct. at 1577, the Supreme Court held that:

> [t]he role of a court in reviewing a determination by the [Administrator] that funds have been misused [under a federal grant program] is to judge whether the findings are supported by substantial evidence and reflect application of the proper legal standards. [Citation omitted]. Where the [Administrator] has properly concluded that funds were misused under the legal standards in effect when grants were made, a reviewing court has no independent authority to excuse repayment based on its view of what would be the most equitable outcome.

*Id.* at 646, 105 S.Ct. at 1563. "Although ... [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824; *see also Hyundai Elecs. Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed.Cir.1990) (touchstone of the arbitrary, capricious, and abuse of discretion standard is rationality; upon consideration of relevant factors and no clear errors of judgment, the decision should be affirmed).

The RA's decision is thus not subject to *de novo* review. The issue is whether his decision was arbitrary or capricious, contrary to law, or not based on substantial evidence. To the extent this result is inconsistent with *County of Suffolk*, this court respectfully declines to follow that decision.

## III. Review of the RA's Decision

The RA determined that the Town's failure to prevent Ingber, who had a declared conflict of interest, from actually being involved in the procurement, preparation or performance of Contract 1–E demonstrated a significant degree of negligence or indifference that breached its duty as a trustee of grant funds. The RA concluded that the Town's failure to take effective action to prevent either the appearance or actuality

of favoritism in the awarding and administration of Contract 1–E called for the disallowance of the entire costs for Contract 1–E. The Town offers a number of arguments why the RA's decision should be overruled.

The Town contends that there is no evidence that it was negligent or indifferent with respect to its efforts to insulate Ingber from involvement with Contract 1–E. It formally removed Ingber from voting on matters involving contracts with Service Scaffold and it relieved him of responsibility for approving payments to the company. The Town also points out that the State Comptroller and DEC found that Ingber's apparent conflict of interest was not in violation of state conflict of interest laws, and that it took a lengthy federal investigation to disclose Ingber's criminal activities involving Contract 1–E. According to the Town, it did everything it could reasonably be expected to do in a situation where it had no reason to believe that Ingber was going to be engaged in fraudulent activities.

While there is some support for the Town's position, the record also contains ample evidence to the contrary. Although the Board passed a resolution prohibiting Ingber's involvement in the award and administration of Contract 1–E, it took no steps to assure compliance with that resolution or with grant conditions. Judge Brieant found LaRuffa's oversight to be an "empty formality." Based on the Comptroller's ruling and the conditions placed on the grant, it should have been plain to the Town that Ingber's position was only tenable if there was a local determination that he was not involved in the "procurement, preparation or performance of any part of Service Scaffold's contracts with the coun-

ty." There is no question that Ingber did in fact get involved in both the procurement and performance of Contract 1–E. There was therefore a grant-violating conflict which the Town could have prevented either by enforcing the limitations nominally placed on Ingber, or by precluding Service Scaffold from bidding. There was no evidence that the Board attempted to go behind Ingber's disclosure statements to determine Ingber's level of involvement with Contract 1–E, despite the fact that everyone on the Board knew of Ingber's relation to Service Scaffold and despite the importance of the Project to the Town. There is no suggestion that the Town informed CDM engineers, Patricia Davis, or any other Town employee of the resolution.

■ It was not unreasonable for the RA to conclude that the Town negligently or indifferently failed to avoid a conflict of interest as required by 40 C.F.R. § 33.300(a),[8] failed to exercise the degree of care required to effectively manage its public trust as required by 40 C.F.R. § 30.210,[9] and failed to prohibit the appearance or actuality of favoritism in the awarding and administration of Contract 1–E as required by the grant.[10] As a result of the ineffectiveness of the resolution, Ingber continued to be involved in the award and the administration of Contract 1–E. The record is unequivocal that Ingber participated in the preparation of the bid specifications and the issuance of addenda. He signed the indemnification agreement enabling Service Scaffold to bid on Contract 1–E. After Service Scaffold won the bid, he was openly involved in the approval of vouchers for payment and insured accelerated payments for a company of which he was an officer. These activi-

---

**8.** Under the provisions of 40 C.F.R. 33.300(a), the Town, as grantee, was required to avoid conflicts of interest and to maintain a code or standards of conduct governing the performance of its officers, employees and agents in the conduct of project work, including procurement and the expending of project funds, which would prohibit such officers, employees and agents from accepting anything of monetary value from contractors.

**9.** Under the provisions of 40 C.F.R. § 30.210, the grantee is required to efficiently and effectively manage grant funds which are deemed to constitute a public trust.

**10.** Under the grant conditions, the Town was to establish safeguards to prohibit employees from using their positions for a purpose that is or gives the appearance of being motivated by a desire for private gain for themselves or others, particularly those with whom they have family, business or other ties.

ties continued even after the Town received notification of EPA's investigation.

■ It is no answer to argue that the Town should not be penalized for not discovering Ingber's activities, when it took EPA and the criminal justice system three years to bring about an indictment. EPA is not in a position to provide local oversight of grant funds. Thus, it places a heavy burden on grantees to uphold the integrity of the procurement process and to maintain public faith in its fair and impartial administration. The Town was in the best position to *prevent* the problem by acting on Ingber's admitted interest in the Service Scaffold contract. The Town warranted to EPA, through the Town counsel, that Ingber "would not be involved in any way with the procurement, preparation or performance of any future contract [with Service Scaffold].... " It also represented that it would "establish safeguards to prohibit employees from using their positions for a purpose that is or gives the appearance of being motivated by desire for private gain...." The Town thus had an affirmative duty to take all reasonable measures to satisfy the requirements of the EPA regulations and grant agreement. It was not unreasonable, therefore, for EPA to treat the Town's lack of performance with respect to that representation as a breach of grant conditions.

■ The Town contends that it was irrationally punished by the RA. The Town points to the statements made by Judge Brieant during Ingber's sentencing hearing that the Town had been "victimized" by Ingber's activities and should be recompensed by him for the losses it suffered because of Ingber's activities. The Judge also stated that he did not see any reason why the Town should lose federal aid for necessary items furnished to the Project. The RA found the Town's argument inapposite:

> This contention, however, ignores the fact that "restitution" was imposed by the Court as a punishment for violations

of criminal statutes. The action taken by EPA in disallowing the costs related to Contract 1–E is a civil administrative action to uphold the integrity of the EPA procurement process and to restore public confidence in its impartial operation. The purpose of the disallowance is corrective, not punitive.

The RA did not arbitrarily disregard Judge Brieant's statements. The relevant federal statutes governing grant funding were not before Judge Brieant. His comments were *obiter dictum* and not based on a review of EPA's statutory and regulatory grant requirements. The limited restitution order in the criminal case does not preclude the RA from exercising his discretion in accordance with the sanctions available under 40 C.F.R. § 30.430. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 362, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984).[11]

■ The Town also contends that the RA was unreasonable in holding it accountable for Ingber's misconduct. This argument misperceives the basis for the withholding of funds. The RA did not impute Ingber's criminal conduct or conflict of interest to the Town. Rather, he held the Town accountable for its own failure to prevent Ingber from being in a position to act on his interests in Service Scaffold, and also for permitting a situation to persist in which the public would readily perceive a conflict of interest. The Town had a nondelegable duty to meet the requirements of the CWA and the regulations. 40 C.F.R. § 30.700(b); *see Smith v. United States*, 497 F.2d 500, 514 (5th Cir.1974). It was not unreasonable to sanction the Town for, in effect, permitting Ingber to police his own activities.

■ The Town argues that the RA exceeded his statutory authority by disallowing the entire federal share of Contract 1–E. Given the fact that the work was performed and the equipment delivered, the Town contends that even if the Town

---

**11.** For the same reasons, it is not relevant that the United States Attorney limited his restitution demand in the criminal proceeding to the cost of the extra equipment and interest on accelerated payments.

violated any of the general standards of performance under the regulations, or the general standards of conduct for trustees of grant funds, such "negligence" does not support a total disallowance.

The limited issue, however, is whether what the RA concluded was arbitrary or unreasonable. What the court would have done if confronted *de novo* with the same issue is not determinative. Having found that the Town failed to comply with the terms of the grant agreement, a range of sanctions could, by regulation, be considered. These sanctions include disallowance of those project costs directly related to the grantee's noncompliance with the applicable procurement and bidding standards and with the specifications of the grant agreement. 40 C.F.R. §§ 30.430(b), 35.965(b). Another possible sanction could have been the termination or annulment of the Town's entire Project grant (40 C.F.R. §§ 30.430(a), 35.965(a)) and disqualification of the Town for further federal financial assistance (40 C.F.R. §§ 30.430(e), 35.-965(e)).

Although such harsher remedies were theoretically available, the RA chose to limit disallowance to the federal share of the cost of Contract 1–E, a small part of the entire Project (about $244,000 out of approximately $16,000,000). While the amount of the penalty is clearly reviewable by the court for arbitrariness, the court is persuaded that the amount chosen here was not unreasonable. It is appropriate for EPA to be concerned about protecting the integrity and the impartiality of the procurement process. *See City of Wheeling, W. Virginia,* 20 Cl.Ct. at 666.[12] More-

over, the amount disallowed (i.e., Contract 1–E) "directly related to the noncompliance." *See* 40 C.F.R. §§ 30.430(b), 35.-965(b).

█ The Town also contends that the EPA is bound by DEC's issuance of the authority to award the grant, along with its concurrent implicit approval of Ingber's continued role in Town affairs. The Town argues that EPA delegated authority to DEC to review and certify the grant application documents for compliance with EPA requirements, *see* 40 C.F.R. § 35.936–21, and that therefore the Government should now be barred from separately questioning under federal regulations the Town's arrangements for limiting Ingber's participation. The legal basis of the Town's argument is unclear. The Town may be arguing that the Government should be estopped from denying funds on the basis of the Town's negligence because the Town relied on DEC's determination that there was no violation of conflict of interest laws. On the other hand, the Town may be arguing that DEC's determination somehow becomes akin to "law of the case" and bars findings to the contrary.

The Town's argument in either form is off the mark. First, as Judge Brieant noted, if Ingber had presented the full facts to DEC, it would have acted differently. Although the nature of DEC's investigation of the potential of a conflict of interest is not clear, it appears from Judge Brieant's opinion and from the RA's decision that Edwin Dassatti, the section chief at DEC responsible for the Project, had conversations with Brian Ingber, and that Ingber

---

**12.** Plaintiff cites *CACI, Inc.—Federal v. United States,* 719 F.2d 1567 (Fed.Cir.1983), for the proposition that "negligence" which results merely in the "appearance" of favoritism where a conflict of interest statute has been satisfied, does not constitute a valid basis for contract annulment. Plaintiff's reliance on *CACI* is inapposite. *CACI* did not involve EPA regulations or a grant award. In that case, the Federal Circuit reversed a Claims Court decision enjoining the Government from awarding a contract. The Claims Court found that there was an apparent conflict of interest between government officials and the successful bidder in violation of an Office of Personnel Management ("OPM") regu-

lation, 5 C.F.R. § 735.201a (1982), which required that government employees avoid appearance of favoritism or partiality. The Federal Circuit reversed, stating that the OPM regulation merely provides general standards to guide government employees in the performance of their duties and does not create specific and precise standards pertaining to government contract procurement. *CACI,* 719 F.2d at 1581. In the case at hand, there was a specific condition in the grant that required the grantee to prohibit its employees from using their positions for a purpose that is or gives the appearance of being motivated by private gain.

sent Dassatti the same documentation relied upon by the New York State Comptroller in connection with earlier questions about Ingber's role. DEC's award was thus based on the same false information. Even assuming that DEC was applying the full breadth of federal conflict of law inquiries, and that it was acting as an agent for EPA, there could be no estoppel due to the fraud. To estop EPA from going beyond DEC's imprimatur, either DEC or EPA, or both, would have had to know the true facts. *See Emeco Indus. v. United States,* 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973).

More to the point, however, the Town's argument ignores the fact that the DEC determination was in part based on the Town's own assurances that, despite Ingber's apparent interest in Contract 1–E, no violation would arise because Ingber would be isolated from the procurement, preparation and performance of Contract 1–E. It is thus a fair question to ask whether the Town satisfied those assurances. The Town is in effect urging that, because DEC took at face value fraudulent statements made by Ingber, EPA is barred from criticizing the Town for its own failure to carry through on monitoring Ingber's activities. Therefore, even under the New York conflict of interest statutes, N.Y.Gen.Mun.Law §§ 801 and 802, DEC's approval was conditioned on future vigilance by the Town.

■ Finally, the Town contends that EPA breached Contract 1–E by refusing to refund the Town's reasonable and necessary expenses incurred in completing that portion of the Project. Those expenses found to be "reasonable and necessary" are paid for by the Government, while those expenses found not to be reasonable and necessary are disallowed. 40 C.F.R. §§ 35.940, 35.940–1, 35.940–2. The Town contends that the RA's disallowance failed to identify any costs incurred in connection with the Contract which were unreasonable or unnecessary.

Once again, the argument is inapposite. Agreements can be breached in more than one particular. There is no dispute that the Town received the tools and equipment specified in Contract 1–E. Moreover, as to the heavy equipment, DEC validated Service Scaffold's purchases as reasonable, necessary, and within the scope of the Project. If there had not been other problems with the Contract, these costs presumably would have been refunded. It was the RA's reasonable determination, however, that the Town had violated other grant terms, those dealing with preventing the reality or appearance of conflicts of interest. That determination created an independent basis for invoking the sanctions listed in 40 C.F.R. § 30.430.

### CONCLUSION

In reviewing an administrative decision, the court may not substitute its own judgment for that of the agency. The court's review of the record in this case does not disclose a basis for overturning the agency's action. The Town's motion for summary judgment is denied and defendant's motion for summary judgment is granted. The Clerk is directed to enter judgment for defendant and to dismiss plaintiff's complaint. No costs.