## In re CARRINGTON GARDENS ASSOCIATES, Debtor/Appellant.

**Carrington Gardens Associates, Plaintiff/Appellant,**

v.

**United States of America, Defendant/Appellee.**

**United States of America, Defendant/Appellant,**

v.

**Carrington Gardens Associates, Plaintiff/Appellee.**

**Nos. 2:00CV584, 2:00CV585.**

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 12, 2001.

Gregory David Stefan, Assistant U.S. Attorney, United States Attorney's Office, Norfolk, VA, for USA.

Gregory Lane Sandler, Epstein & Sandler, P.C., Norfolk, VA, for Carrington Gardens Associates.

Debera F. Conlon, Office of U.S. Trustee, Norfolk, VA, U.S. Trustee.

## MEMORANDUM OPINION AND FINAL ORDER

SMITH, District Judge.

This matter is before the court on appeal by Carrington Gardens Associates ("Carrington Gardens") and cross-appeal by the United States from a Memorandum Opinion and Order of the United States Bankruptcy Court for the Eastern District of Virginia, filed May 5, 2000. The bankruptcy court granted the United States' motion for summary judgment on Carrington Gardens' breach of contract claims. For the reasons set forth below, the deci-sion of the bankruptcy court is **AFFIRMED**.

## I. Background

### A. Factual History

The undisputed facts are as follows. Carrington Gardens is a Virginia limited partnership, whose principal business activity was the ownership and operation of a multi-family apartment project located in Richmond, Virginia ("the Project"). Carrington Gardens' general partner is CGFA, Incorporated, and Herbert J. Zukerman is President of CGFA.

Carrington Gardens acquired the Project on May 15, 1985, assuming a First Deed of Trust on the property as part of the acquisition. The Federal National Mortgage Association ("Fannie Mae") held a Note secured by the First Deed of Trust, with an original principal balance of $1,212,300. The United States Department of Housing and Urban Development ("HUD") insured payment to the mortgagee pursuant to Section 236 of the National Housing Act (the "NHA"). *See* 12 U.S.C. § 1715z–1. In exchange for the United States' commitment to insure this loan ("the 236 Loan"), Carrington Gardens executed a regulatory agreement with HUD, dated May 16, 1985 ("the 236 Regulatory Agreement").

The 236 Regulatory Agreement imposed duties on Carrington Gardens and governed the manner in which Carrington Gardens was required to operate the Project. Additionally, the 236 Regulatory Agreement regulated the rents that Carrington Gardens was permitted to charge residents of the Project.

The 236 Regulatory Agreement also included a requirement that Carrington Gardens maintain a reserve fund to be used for the replacement of capital items ("the Replacement Reserve Fund"). Carrington Gardens was required to deposit $416 per month into this fund, which was controlled at all times by the mortgagee. Carrington Gardens was permitted to make withdraw-

als from the fund only upon HUD's written consent. In the event of a default by Carrington Gardens, HUD was authorized to apply the balance of the Replacement Reserve Fund to the accelerated balance of the mortgage.

HUD and Carrington Gardens entered into a Housing Assistance Payments contract ("the HAP Contract"), dated September 30, 1987, pursuant to which HUD agreed to subsidize the rents of fifty units in the Project. These units are known as Loan–Management Set–Aside ("LMSA"), or Section 8, units. Under the terms of the HAP Contract, Carrington Gardens was required to comply with applicable housing regulations and the 236 Regulatory Agreement.

The HAP Contract provided a mechanism for adjustments of rents for the units it covered in accordance with applicable regulations and administrative procedures. Carrington Gardens would submit an application to HUD requesting an increase, and HUD would evaluate the application based on whether Carrington Gardens was in compliance with its regulatory and contractual agreements and whether the increase was financially justified based on audited financial statements from the Project.

On February 28, 1989, Carrington Gardens obtained a loan in the amount of $307,200 ("the 241 Loan"), in order to finance capital improvements on the Project. Carrington Gardens executed a Second Deed of Trust payable to Marble Mortgage Corporation ("Marble"). The note evidenced a nonrecourse loan insured by HUD pursuant to Section 241 of the NHA. *See* 12 U.S.C. § 1715z–6. Carrington Gardens executed a regulatory agreement with HUD ("the 241 Regulatory Agreement") that is similar in all material respects to the 236 Regulatory Agreement.

In January, 1989, Carrington Gardens entered into a construction contract with William A. Simkins Associates to perform the construction financed by the 241 Loan.[1] Disagreements regarding the construction arose between HUD and Carrington Gardens before the construction was complete. In April 1990, HUD refused to continue insuring the 241 Loan. HUD relied on the findings of several of its inspectors to justify its refusal to continue insuring the loan. Marble then refused to make further advances. The construction was never completed, although the parties dispute the reasons.[2]

As a result of Marble's refusal to make further advances of loan proceeds, Carrington Gardens experienced financial difficulties, and, consequently, it missed its April 1990 payment on the 236 Loan. Carrington Gardens later defaulted on the 241 Loan, which remained in default from April 26, 1991 onwards.

HUD sent a notice of default on the 236 Loan to Carrington Gardens on May 4, 1990, and informed Carrington Gardens that, if it failed to enter into an acceptable reinstatement plan, HUD would withhold payments under the HAP Contract and apply them to the 236 Loan delinquency. The 236 Loan was assigned to HUD on April 10, 1991, and Zukerman was notified of the assignment by letter dated June 28, 1991. The 241 Loan was assigned to HUD on November 11, 1991, and Zukerman was notified of the assignment by letter dated November 12, 1991. HUD informed Zukerman by letter dated April 8, 1992, that no funds would be available under the 241 Loan.

---

1. Mr. Simkins was sentenced by this court in 1992 in an unrelated criminal case, after having pled guilty to a criminal information charging one count of wire fraud in violation of 18 U.S.C. § 1343. *See United States v. Simkins,* No. CR–92–109–N (E.D.Va. Sept. 28, 1992).

2. Many of Carrington Gardens' disputed issues of fact center on the disagreements surrounding the construction project. As explained below, however, the court has determined that the claims deriving from these factual disputes are barred by the statute of limitations, and thus, the court does not find these factual issues to be material.

On June 22, 1992, HUD's Office of Inspector General issued an audit report covering the activities of the project during the period of January 1, 1989 to September 30, 1991. The audit report, conducted to determine if the project was being operated in accordance with the regulatory agreements and HUD directives, contained twenty-eight adverse findings. On October 26, 1995, HUD issued a supplemental report noting that all but four of the adverse audit findings had been cleared. The four adverse audit findings that remained were: (1) Carrington Gardens overpaid at least $12,740 in payroll costs to its independent management agent, Lawson Realty; (2) Carrington Gardens improperly used Project operating funds, totaling $14,960, for capital improvements to the Project; (3) Carrington Gardens did not provide sufficient documentation to support $127,972 in costs paid out of Project funds; and (4) the Project owners improperly withdrew $17,175 from the tenant security trust account in order to fund operating deficits. HUD determined that these uncleared audit findings constituted violations of the 236 Regulatory Agreement.

Carrington Gardens submitted nine formal rental increase applications between 1986 and 1997, of which four were approved and five were denied. The five rental increase requests that were denied were made between June 1992 and June 1997, and the denials were justified, at least in part, on the basis of HUD's finding that Carrington Gardens did not have sufficient deposits in its security trust account, the delinquency on the 241 Loan, and unresolved audit irregularities.

Additionally, Carrington Gardens made several requests between October 1992 and October 1995 for the release of funds from its Replacement Reserve Fund, which HUD denied. The basis for HUD's denial included the fact that Carrington Gardens failed to maintain sufficient funds in the Replacement Reserve Fund, as required by the 236 Regulatory Agreement and HUD policy, the delinquency on the 241 Loan, and the uncleared audit findings.

Based on the 241 Loan delinquency, HUD's Richmond office recommended on September 26, 1995, that the Secretary of HUD foreclose on the Project. HUD advised Zukerman on October 12, 1995, that the mortgage was in default, that HUD had declared the entire balance due and payable, and that HUD would proceed with foreclosure. HUD gave Zukerman twenty-one days to work with HUD in order to avoid foreclosure. On May 20, 1996, HUD rescinded its declaration of default and withdrew the foreclosure.

On October 11, 1996, HUD's Richmond Office again recommended foreclosure, based in part on Carrington Gardens' failure to correct the audit findings and its continued violation of the Regulatory Agreements and HUD regulations. This time, HUD proceeded with the foreclosure.

## B. Procedural History

On October 22, 1997, a Notice of Default and Foreclosure Sale was mailed to Carrington Gardens, advising Carrington Gardens that a foreclosure sale would be held on December 12, 1997. On December 9, 1997, Carrington Gardens filed a petition for relief under Chapter 11 of the Bankruptcy Code. On May 6, 1998, Carrington Gardens filed the instant action in the bankruptcy court.

Carrington Gardens' complaint consists of essentially three claims.[3] First, Carrington Gardens alleged that HUD wrongfully refused to make disbursements of proceeds of the 241 Loan, thereby breach-

---

**3.** Carrington Gardens also requested declaratory relief from the bankruptcy court, which the court denied. Carrington Gardens has not pursued this claim on appeal, and the court does not consider it. *See Humboldt Express, Inc. v. Wise Co. (In re Apex Express Corp.),* 190 F.3d 624, 630 n. 5 (4th Cir.1999) (an issue not argued in a party's brief is deemed waived on appeal).

ing the 241 Regulatory Agreement. As a result, Carrington Gardens was unable to complete necessary repairs, which led in turn to HUD's refusal to grant the rental increases Carrington Gardens later requested. Without the rental increases, Carrington Gardens was unable to make its payments on the 241 Loan, resulting in its default.

Carrington Gardens' second claim is that HUD wrongfully refused to clear the four adverse audit findings remaining on October 26, 1995, despite the fact that Carrington Gardens had supplied information to HUD that, in Carrington Gardens' view, was sufficient. Carrington Gardens maintains that HUD's refusal to clear the adverse audit findings is a breach of the 236 Regulatory Agreement. As a result of HUD's refusal to clear the audit findings, Carrington Gardens alleges that HUD declared the 236 Loan in default, but that this declaration of default was wrongful, thereby constituting another breach of the 236 Regulatory Agreement.

Finally, Carrington Gardens asserts that as a further result of HUD's wrongful determination that Carrington Gardens had breached the Regulatory Agreements, HUD refused to approve Carrington Gardens' rental increase requests and its requests for disbursements from the Replacement Reserve Fund (the "financial requests"). Carrington Gardens asserts that these refusals by HUD constituted additional breaches of the Regulatory Agreements.

HUD filed a proof of claim on June 8, 1998, based on the mortgage default. On November 30, 1998, HUD moved for summary judgment on Carrington Gardens' adversary complaint. The bankruptcy court determined that all claims that were derivative of HUD's refusal to continue

insuring disbursements from the 241 Loan were barred by the statute of limitations. The bankruptcy court determined that the remaining claims were not time-barred, but ruled that the United States was entitled to summary judgment on these claims.

Carrington Gardens now appeals the bankruptcy court's ruling, arguing that the bankruptcy court erred in finding that some of its claims were barred by the statute of limitations and in finding that the United States was entitled to summary judgment on the remaining claims. The United States cross-appealed, but indicated that it desired to pursue its claims only if this court found in favor of Carrington Gardens on its issues of appeal. Because the court affirms the bankruptcy court's decision, the court does not reach the issues raised on cross-appeal by the United States.[4]

## II. Analysis

### A. Jurisdictional Issues

 A federal court is obligated to ensure that it has jurisdiction over an action, even if the parties do not contest it. *See, e.g., McCorkle v. First Pa. Banking & Trust Co.,* 459 F.2d 243, 244 n. 1 (4th Cir.1972); *cf. Randall v. United States,* 95 F.3d 339, 344–45 (4th Cir.1996) (stating that an appellate court must satisfy itself both of its own jurisdiction and that of the courts below). Special considerations apply when the United States is sued.

In order for a claim against the United States to be heard, first there must be, because sovereign immunity requires it, consent to be sued; and because, with the exception of the Supreme Court, the subject matter jurisdiction of federal courts is defined by statute, there must be, second, Congressional provision of a

---

4. The issues raised by the United States in its cross-appeal are: the case is not a contract case, but rather is subject to the Administrative Procedure Act (the "APA"), and, under the APA, HUD's decisions are not subject to judicial review; if HUD's decisions are subject to review, they must be reviewed solely on the basis of the administrative record compiled by HUD; HUD did not act arbitrarily or capriciously; and sovereign immunity bars Carrington Gardens' claim for damages.

court with the authority to hear the claim and grant relief.

*Quality Tooling, Inc. v. United States,* 47 F.3d 1569, 1575 (Fed.Cir.1995). A grant of subject matter jurisdiction is not the equivalent of a waiver of sovereign immunity; Congress does not waive sovereign immunity by "establish[ing] a subject matter that is within the competence of federal courts to entertain." *Randall,* 95 F.3d at 345 (internal quotation marks omitted). Thus, in order for the bankruptcy court to have had jurisdiction over this action, there must be both a waiver of sovereign immunity and a grant of subject matter jurisdiction. The waiver of immunity and the grant of jurisdiction need not come from the same source, however. *See Anderson v. FDIC,* 918 F.2d 1139, 1143 (4th Cir.1990).

### 1. Subject Matter Jurisdiction

The bankruptcy court had subject matter jurisdiction over this action. Congress has provided that "[n]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or *related to* cases under title 11." 28 U.S.C. § 1334(b) (emphasis added). Additionally, "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). The Eastern District of Virginia has so provided. *See* Standing Order (E.D. Va. July 27, 1984, *nunc pro tunc* to July 10, 1984); *Poplar Run Five Ltd. P'ship v. Virginia Elec. & Power Co.*

*(In re Poplar Run Five Ltd. P'ship),* 192 B.R. 848, 855 n. 2 (Bankr.E.D.Va.1995).

■ To determine if a civil proceeding is "related to" a case under title 11, the Fourth Circuit has adopted the Third Circuit's test, cited with approval by the Supreme Court: " 'An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.' " *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1002 n. 11 (4th Cir.1986) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)); *see Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (quoting *Pacor* and noting that eight other circuits had adopted the Third Circuit's test); *New Horizon of N.Y., LLC v. Jacobs,* 231 F.3d 143, 151 (4th Cir.2000) (noting that the Fourth Circuit has adopted the *Pacor* test to determine if the district court, or derivatively the bankruptcy court, has "related-to" jurisdiction).

■ Clearly, the outcome of this case will have an impact on the administration of Carrington Gardens' bankruptcy estate. This case is, therefore, related to a case under title 11. Accordingly, the bankruptcy court had subject matter jurisdiction over this action, and consequently, this court has jurisdiction over this appeal, pursuant to 28 U.S.C. § 158(a)(1).

### 2. Waiver of Sovereign Immunity

■ The United States has waived sovereign immunity under 11 U.S.C. § 106, the section of the bankruptcy code containing explicit waivers of sovereign immunity.[5] That section provides in relevant part:

**5.** The bankruptcy court considered and rejected several additional potential sources of waiver. This court finds it unnecessary to consider whether these other statutory provisions provide waivers. In particular, the court makes no finding regarding whether the waiver of sovereign immunity provided in the

Tucker Act, *see* 28 U.S.C. § 1491, is forum-specific, providing a waiver only in the United States Court of Federal Claims. *See Carrington Gardens Assocs. v. United States (In re Carrington Gardens Assocs.),* 248 B.R. 752, 768 n. 7 (Bankr.E.D.Va.2000).

(b) A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

(c) Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

11 U.S.C. § 106(b), (c). In the context of interpreting another provision, the Supreme Court has stated that the precursors to these sections, which are similar in material respects, "waive sovereign immunity with regard to monetary relief in two settings: compulsory counterclaims to governmental claims, § 106[ (b) ]; and permissive counterclaims to governmental claims capped by a setoff limitation, § 106[ (c) ]." *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992).

In this case, the United States filed its proof of claim after Carrington Gardens filed its adversary complaint with the bankruptcy court. Thus, Carrington Gardens' claim is not technically a counter-

claim. Nonetheless, the statute does not by its terms apply only to counterclaims. And, to the extent the Supreme Court intended by its use of "counterclaim" to indicate the degree of relatedness required of a claim, that degree of relatedness obtains here; if the United States had filed its proof of claim first, Carrington Gardens' claim here would have been a compulsory counterclaim. Moreover, in a case with a similar procedural posture,[6] the Fourth Circuit, holding that § 106 constituted a waiver of immunity, stated that "Congress enacted 11 U.S.C. § 106 of the Bankruptcy Code specifically to waive sovereign immunity in situations such as the one before us." *Anderson,* 918 F.2d at 1143. Therefore, the court concludes that the United States, by filing its proof of claim, has waived its immunity with respect to Carrington Gardens' complaint, pursuant to 11 U.S.C. § 106(b).

### 3. Statute of Limitations

■ The United States' waiver of immunity is expressly conditioned upon the imposition of a six-year statute of limitations. *See* 28 U.S.C. § 2401(a) (providing that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues").[7] Moreover,

---

**6.** In *Anderson v. FDIC,* the plaintiff-debtor had organized and served as an officer for SeaBank Savings, FSB, a federally chartered savings bank. The debtor pledged his stock in SeaBank in order to secure a debt owed to Park Bank of Florida. When Park Bank was declared insolvent, the FDIC was appointed receiver, and assigned the debtor's SeaBank stock to the FDIC in its corporate capacity. The FDIC later sold the debtor's stock to members of SeaBank's board of directors. The debtor filed an action in state court against the directors, seeking a declaration that he was the owner of the stock. He later added the FDIC as a defendant, and the FDIC removed the case to federal district court. Thereafter, the debtor filed a petition in bankruptcy, and the FDIC filed a proof of claim with the bankruptcy court, seeking to recover the difference between the sale price of the SeaBank stock and the amount of the debtor's

debt. The debtor subsequently amended his complaint to add additional claims against the FDIC. *See Anderson,* 918 F.2d at 1140–41. The Fourth Circuit held that the district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and that the United States had waived sovereign immunity pursuant to 11 U.S.C. § 106. *See id.* at 1142–44.

**7.** The parties agree that Carrington Gardens' claims are subject to the six-year limitations period established in 28 U.S.C. § 2401(a). Additionally, the parties do not dispute the factual scenario of this case. *See supra* Part I.A. Rather, the dispute centers on the legal questions of when the claims accrued under the undisputed facts and whether the "continuing claim doctrine" or the "inherently unknowable doctrine" is applicable to this factual scenario. This court concludes that the bankruptcy court correctly determined the

"[u]nlike an ordinary statute of limitations, § 2401(a) is a jurisdictional condition attached to the government's waiver of sovereign immunity." *Spannaus v. United States Dep't of Justice,* 824 F.2d 52, 55 (D.C.Cir.1987). Because the statute of limitations is an express limitation on the government's waiver of sovereign immunity, it must be strictly construed. *See Brown Park Estates–Fairfield Dev. Co. v. United States,* 127 F.3d 1449, 1454 (Fed. Cir.1997). Carrington Gardens asserts that the bankruptcy court erred in determining that some of its claims were barred by the statute of limitations.

■ "A claim first accrues within the meaning of the statute of limitations when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Brown Park Estates,* 127 F.3d at 1455 (internal quotation marks omitted); *see Spannaus,* 824 F.2d at 56 ("A cause of action against an administrative agency 'first accrues,' within the meaning of § 2401(a), as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court.").

■ The bankruptcy court correctly concluded that any claim based on HUD's refusal to insure proceeds of the 241 Loan accrued in April, 1992, when Carrington Gardens received notice of HUD's decision in this regard. HUD wrote a letter to Zukerman on April 8, 1992, stating that no additional mortgage funds were available, because the ownership had allowed the loan to go into default. Carrington Gardens filed its complaint on May 6, 1998, more than six years after the accrual date, and hence, the claim that HUD breached the 241 Regulatory Agreement by wrongfully refusing to make disbursements of

241 Loan proceeds is barred by the statute of limitations.[8]

■ Additionally, the bankruptcy court correctly concluded that the claim that HUD wrongfully refused to clear the adverse findings identified in the October 26, 1995 audit report is not barred by the statute of limitations, because it clearly accrued less than six years before Carrington Gardens' complaint was filed on May 6, 1998. Similarly, the claim that HUD breached the 236 Regulatory Agreement by declaring the 236 Loan in default on the basis of these audit findings is not barred.

■ Finally, the bankruptcy court concluded that Carrington Gardens' remaining claim—that HUD further breached the Regulatory Agreements by wrongfully refusing later financial requests, based on these earlier alleged breaches—was barred in part by the statute of limitations. The court explained that, because the claim that HUD's declaration of default on the 236 Loan is not barred, neither are any claims derivative of this alleged breach. In contrast, any claims that are derivative of HUD's refusal to insure 241 Loan proceeds are barred. The court concluded that only refusals of financial requests that occurred subsequent to October 26, 1995, could be considered derivative of the alleged violation of the 236 Regulatory Agreement, and so only these claims are not barred by the statute of limitations.

In its brief to this court, Carrington Gardens asserts that the bankruptcy court mischaracterized its claims, resulting in an erroneous application of law to fact. Carrington Gardens argues that it was error for the bankruptcy court to focus on the conduct of the parties with respect to the 241 Loan, the adverse audit findings, and other alleged breaches of the Regulatory Agreements. Rather, Carrington Gardens

accrual dates and that neither tolling doctrine is applicable here. *See infra* at 631 – 34.

**8.** Carrington Gardens argued to the bankruptcy court that this claim did not accrue with its receipt of the April 8, 1992 letter, because

Carrington Gardens and HUD were negotiating a loan workout. Carrington Gardens appears to have abandoned this argument on appeal, and so the court does not consider it. *See supra* note 3.

contends that the proper analysis surrounds HUD's decision-making process at the time of each financial request by Carrington Gardens.[9]

Carrington Gardens fails to understand, however, that HUD's decision-making process with regard to Carrington Gardens' financial requests was predicated on the actions on which the bankruptcy court properly focused; each decision by HUD was based on its prior determination regarding the 241 Loan, the audit reports, and other violations of the Regulatory Agreements. Although Carrington Gardens would have the court ignore the question of whether HUD was justified in declaring the 241 Loan in default and consider only the process by which HUD decided to deny the later requests for rental increases and further disbursements, this is impossible, because, in order to prove that HUD breached the Regulatory Agreements by denying Carrington Gardens' financial requests, Carrington Gardens would be required to prove that the denials were, in fact, wrongful.

Indeed, it is Carrington Gardens' theory of the case that HUD improperly declared the 241 Loan in default and relied on inaccurate audit findings respecting the 236 Loan, which then led it to further breach the Regulatory Agreements by denying Carrington Gardens' later requests for rental increases and disbursements from the Replacement Reserve Fund. Thus, Carrington Gardens' argument that HUD breached the Regulatory Agreements depends in part on Carrington Gardens' allegation that HUD's declaring the 241 Loan in default was wrongful. Specifically, the reason later denials of financial requests constituted breaches of the Regulatory Agreements, according to Carrington Gardens, is that the denials were based on a wrongful declaration of default. To the extent that Carrington Gardens must prove that HUD wrongfully declared the 241 Loan in default in order to advance its theory of the case, Carrington Gardens' claim is barred.[10]

■ Carrington Gardens attempts to avoid the statute of limitations problem by arguing that the "continuing claim" doctrine applies here. *See Brown Park Estates,* 127 F.3d at 1456–57; *see also Elephant Butte Irrigation Dist. v. Department of the Interior,* 160 F.3d 602, 606 n. 4 (10th Cir.1998) (recognizing doctrine). Carrington Gardens emphasizes that its theory of the case requires the court to focus on HUD's decision-making process at the time of each financial request, rather than (solely) on HUD's declaration of default or its reliance on the audit results. Misunderstanding the nature of the doctrine, Carrington Gardens asserts that it is based on "a distinction between damage claims which are entirely based upon an action which has occurred outside of the limitations period, and damage claims which recur, as a result of actions by the Defendant which constitute separate and

---

9. Carrington Garden states that

> HUD's use of these alleged violations as a basis to refuse Plaintiff's financial requests, constituted a breach by HUD of the Regulatory Agreement each time that a request was made. The Plaintiff's damage claims do not rise directly from alleged errors by HUD in the handling of the 241 loan, or in the performance of the Audit. Rather, the damage claims stem from HUD's decision-making actions relating to Plaintiff's periodic financial requests to enable the Plaintiff to continue to operate the project and HUD's repeated failure to comply with its obligation to properly fund the project.

*Brief of the Plaintiff–Appellant,* at 15–16 (Aug. 23, 2000).

10. The bankruptcy court appears to have viewed Carrington Gardens' allegations regarding HUD's denial of financial requests as a claim for consequential damages resulting from the alleged breach of the 241 Regulatory Agreement, rather than as a claim of additional, subsequent breaches. Because it found that any damage claim predicated on the original breach was time-barred, the bankruptcy court ruled that Carrington Gardens could not seek these consequential damages. The same conclusion is reached under either analysis.

divisible conduct." *Brief of the Plaintiff–Appellant,* at 19–20 (Aug. 23, 2000).

Carrington Gardens derives its mischaracterization of the doctrine from *Brown Park Estates,* in which the Federal Circuit explained that a continuing claim was found in cases where

> the plaintiff's claim could be broken down into a series of independent and distinct wrongs or events, each such wrong or event having its own associated damages. Each wrong constituted an alleged violation of a statute or regulation that accrued when that particular wrong occurred, independent of the accrual of other wrongs.

*Brown Park Estates,* 127 F.3d at 1457. The *Brown Park Estates* court contrasted cases presenting a continuing claim, as described above, to those that did not constitute continuing claims, namely, those involving "a single distinct event, which may have continued ill effects later on." *Id.* at 1456. The Federal Circuit later clarified, however, that terminology such as "a single distinct event"

> is simply descriptive of the type of case that falls outside the continuing claim doctrine. To determine whether a case falls inside or outside of that description, we return, as we must, to the governing considerations set out in [*Friedman v. United States,* 159 Ct.Cl. 1, 310 F.2d 381 (1962)], specifically, has Congress entrusted an administrative officer with the determination of the claimant's entitlement ...; does the case involve significant factual determinations, or does it turn on pure issues of law or specific facts which the court is to decide for

itself ...; and does the case call upon the court to address broad concepts rather than resolve sharp and narrow factual issues ....

*Hatter v. United States,* 203 F.3d 795, 799 (Fed.Cir.) (en banc), *cert. granted,* —— U.S. ——, 121 S.Ct. 338, 148 L.Ed.2d 272 (2000). The key distinction between continuing claims and other claims, as explained in *Friedman,* is that a continuing claim is independent of administrative action. *See id.* at 798; *Friedman,* 310 F.2d at 384–87. The *Friedman* court emphasized that a continuing claim arises in cases where no administrative agency has been set up to decide the claim, so that the court decides the issues involved *de novo;* and there is no condition precedent to the accrual of the cause of action that an agency make a factual determination or that the plaintiff exhaust some special procedure or remedy. *See Friedman,* 310 F.2d at 384–85.

Carrington Gardens has not asserted a continuing claim. By its own admission, it challenges HUD's decision-making process. Carrington Gardens' claim is not based on a purely legal question or a narrow factual issue, but on the decisions of an agency made by drawing on that agency's expertise. Such a claim is decidedly not a continuing claim, but rather falls in the other category of cases, those in which "the cause of action does not accrue until after a determination entrusted by Congress to an administrative official." *Hatter,* 203 F.3d at 798 (internal quotation marks omitted).[11]

---

11. The court notes that the proper analysis of a continuing claim is that articulated in *Friedman* and summarized above, but Carrington Gardens' argument nevertheless fails on its own terms. Carrington Gardens argues that its claim is a continuing claim because it has asserted separate damage claims. Thus, Carrington Gardens asserts that its *damages* recurred as the result of HUD's "separate and divisible conduct." *Brief of the Plaintiff–Appellant,* at 20 (Aug. 23, 2000). The quoted language from *Brown Park Estates,* however, explains that a continuing claim stems from a series of wrongful *acts,* where each act is independent of the other wrongful acts. Carrington Gardens identifies HUD's denials of its financial requests as the wrongs for which it seeks redress, but these wrongs are *not* independent of the allegedly wrongful act of declaring the 241 Loan in default. Rather, these later allegedly wrongful acts are only wrongful if the declaration of default was wrongful.

In another attempt to avoid the statute of limitations problem, Carrington Gardens asserts that the "inherently unknowable" doctrine may be invoked here to toll the limitations period. *See Entines v. United States*, 39 Fed. Cl. 673, 679–81 (1997). The court does not find that doctrine applicable here, however.

The "inherently unknowable" doctrine is invoked under circumstances where the plaintiff's claim for damages "is unknowable by its very essence, i.e., its existence at the critical moment simply cannot be ascertained," and not under circumstances where the claim "is somewhat difficult to discover, or is not entirely obvious." *Id.* at 680 (internal quotation marks omitted). An example cited by the *Entines* court, and noted by Carrington Gardens, is a case in which a defendant delivers the wrong type of tree to a plaintiff, who is unable to discover the error until many years later when the tree bears fruit. *See id.* at 680–81.

The "inherently unknowable" doctrine is not appropriate in a situation such as that here, where the plaintiff's damages result from an action taken by the defendant subsequent to the defendant's proclamation that the plaintiff has breached the contract. When one party has announced a breach by the other party to a contract, it is not "inherently unknowable"—rather, it is reasonably foreseeable—that the aggrieved party will refuse to perform its executory duties under the contract. Thus, the court concludes that Carrington Gardens has failed to show that the "inherently unknowable" doctrine applies here. *See id.* at 680 ("[B]ecause tolling is a judicially created exception to the statute of limitations, the plaintiff bears the burden of clearly demonstrating that … the … 'inherently unknowable' exception is applicable.").

The claim that HUD breached the 241 Regulatory Agreement, as well as all claims of breach that are derivative of this alleged breach, are barred by the statute of limitations. Hence, the bankruptcy court's conclusions in this regard are correct.

### B. Summary Judgment on Remaining Claims

The court now turns to the issue of whether the United States is entitled to summary judgment on Carrington Gardens' remaining claims involving the alleged breach of the 236 Regulatory Agreement and the corresponding derivative breaches. This court reviews *de novo* the grant of summary judgment by the bankruptcy court. *See Stackhouse v. Plumlee (In re Plumlee)*, 236 B.R. 606, 609 (E.D.Va.1999).

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when, viewing the record as a whole and in the light most favorable to the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 (4th Cir.1985). A party opposing a motion for summary judgment may not rest on the pleadings alone, but instead must show that "specific, material facts exist that give rise to a genuine triable issue." *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619, 623–24 (4th Cir. 1995); *see* Fed.R.Civ.P. 56(e). A mere "scintilla of evidence" is insufficient to withstand a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Rather, the evidence must be such that a jury could reasonably find for the nonmovant. *See id.*

Before determining whether Carrington Gardens has raised a genuine issue of material fact regarding whether HUD breached the 236 Regulatory Agreement, it is necessary to determine the proper standard of review of this contract dispute between Carrington Gardens and the Unit-

ed States. The bankruptcy court applied the standards of review provided in the Administrative Procedure Act (the "APA"). *See* 5 U.S.C. § 706. Carrington Gardens argues that the bankruptcy court erred in adopting the deferential standard of review of agency action provided in the APA, asserting that the proper standard of review is the *de novo* review standard that a court would ordinarily apply to contract disputes.[12]

The court relies on *Pender Peanut Corp. v. United States*, 20 Cl.Ct. 447 (1990), to determine the proper standard of review. There, the United States Claims Court observed that "[w]hile the Administrative Procedure Act (APA) does not establish an independent basis for jurisdiction, it provides the framework for determining when and how this court may review agency action." 20 Cl.Ct. at 451.[13] After analyzing relevant portions of the APA, that court concluded that

> the APA principally arises in the Claims Court when there is some question about when and under what standards this court may review agency action which gives rise to a money damages claim. While this is a limited application, the APA nevertheless can play a vital role in supplying a uniform, struc-

tured, and methodological approach to reviewing agency actions.

*Id.* at 451 n. 3.[14] The case now before this court might well have been brought in the Claims Court, if not for the fact that Carrington Gardens filed a petition in bankruptcy. Thus, the court finds the analysis of the Claims Court persuasive here.

The court also finds *Burgin v. Office of Personnel Management*, 120 F.3d 494 (4th Cir.1997), instructive. There, in a contract dispute between a plaintiff and an agency, which arose under the APA, the Fourth Circuit held that the proper standard of review depends on the nature of the action being reviewed. If resolution of the dispute requires "reference to the regulatory provisions governing the features of an acceptable contract," the court should defer to the agency, but when "the essential question is one of the interpretation of [a] contract's language, [which is] a question of law clearly within the competence of courts, . . . we review [it] *de novo.*" 120 F.3d at 497–98. Additionally, the court stated that "[w]ith respect to factual matters to which the contract interpretation may be applied, we review only to determine if the agency's determination was arbitrary or capricious, although even this inquiry into the facts is to be searching and careful." *Id.* at 498 (internal quota-

---

**12.** The United States argues that the court should not review Carrington Gardens' claims at all, because the Regulatory Agreements do not create any duties on the part of HUD that could support Carrington Gardens' claims. The court does not address this argument, because, as explained below, Carrington Gardens has failed to raise a genuine issue of material fact, and the United States is entitled to summary judgment on that ground.

**13.** The posture of this case is somewhat unusual. Normally, in a case involving judicial review of administrative action, the court's jurisdiction is authorized by the Administrative Procedure Act (APA), and then it is clear that the standards of the APA govern that review. Administrative action has been reviewed upon a grant of subject matter jurisdiction from a source other than the APA, however, in cases before the United States Court of Federal Claims, and its predecessor

courts, the United States Claims Court and the Court of Claims. When a plaintiff sues an administrative agency in contract, such claims come within the purview of the Tucker Act, *see* 28 U.S.C. § 1491, and are generally heard by the Court of Federal Claims, which has been given exclusive jurisdiction over Tucker Act claims involving more than $10,000. *See, e.g., Randall,* 95 F.3d at 346–47. This grant of exclusive jurisdiction has been overridden, however, by 28 U.S.C. § 1334(b), which gave the bankruptcy court jurisdiction in this case.

**14.** The court noted that the claims courts had invoked the APA standards for reviewing agency action giving rise to monetary damage claims in over fifty opinions, even though subject matter jurisdiction was authorized pursuant to the Tucker act, not the APA. *See Pender Peanut,* 20 Cl.Ct. at 452 n. 3.

tion marks omitted).[15]

 Carrington Gardens asserts that HUD breached the 236 Regulatory Agreement by failing to clear the adverse audit reports in response to information it submitted. Additionally, Carrington Gardens alleges that HUD breached the agreement by declaring a default on the basis of the uncleared audit findings. The court finds that the process of investigating violations of regulatory agreements and declaring defaults is committed to HUD's discretion. *Cf. United States v. Winthrop Towers,* 628 F.2d 1028, 1036 (7th Cir.1980) (holding, on the basis of "the highly discretionary nature of the decisions HUD must make in the course of administering loans it has insured or taken by assignment," that judicial review of HUD's decision to foreclose should be deferential). In this case, the audit reflected that Carrington Gardens had, among other alleged improprieties, misused security deposit funds. This is clearly a violation of the 236 Regulatory Agreement, which provides that "[a]ny fund collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account." U.S. Ex. 114 (the 236 Reg-

ulatory Agreement), ¶ 6(g).[16] Thus, unless HUD acted arbitrarily and capriciously in determining that such a violation had occurred, HUD did not wrongfully declare a default of the Regulatory Agreement on the basis of this finding alone.[17]

With regard to the finding by the HUD auditor that Carrington Gardens improperly withdrew money from the tenant security trust account in order to cover operating deficits, Carrington Gardens states that it was forced to do so because HUD refused to continue insuring the loan proceeds, and it had no other source of funds. Carrington Gardens also notes that the funds have since been replaced. However, Carrington Gardens does not dispute that it used the security account funds for improper purposes, and HUD did not act in an arbitrary and capricious manner in so finding. Thus, Carrington Gardens has not raised a genuine issue of material fact regarding whether HUD was justified in refusing to clear this audit finding and in declaring a default of the 236 Regulatory Agreement. Accordingly, the United States is entitled to summary judgment on this claim.

**15.** In support of its position that *de novo* review is appropriate, Carrington Gardens relies solely on *Christopher Village, Limited Partnership v. Retsinas,* 190 F.3d 310 (5th Cir. 1999). In *Christopher Village,* the Fifth Circuit acknowledged that "[t]he circuit courts have unanimously agreed" that a decision by HUD regarding the amount of a rent increase is unreviewable, 190 F.3d at 315, but stated that these cases "universally recognize that a court's refusal to review HUD rent decisions does not necessarily obtain when HUD ignores a plain statutory duty, exceed[s] its jurisdiction, or commit[s] constitutional error," *id.* at 315–16 (alterations in original) (internal quotation marks omitted). In the case before it, the Fifth Circuit found that HUD, by refusing to even consider an application for a rent increase, had violated both the regulatory agreement between HUD and the property owner and HUD's regulations. *See id.* at 316. Importantly, the court reviewed the case under the arbitrary and capricious standard. Thus, this case is not inconsistent with the cases discussed above.

**16.** This Exhibit is part of the Administrative Record that the United States submitted to the bankruptcy court.

**17.** In fact, HUD gave many reasons in justification for its declaration of default, including the remaining three uncleared audit findings. Carrington Gardens disputes many of these reasons. The bankruptcy court found that Carrington Gardens had raised a genuine factual issue with regard to the third audit finding, but nevertheless granted summary judgment for the United States because it found that Carrington Gardens had failed to raise a genuine factual issue with regard to the others, and any one of the remaining three uncleared audit findings was sufficient to justify HUD's declaration that Carrington Gardens had breached the Regulatory Agreements. This court finds it unnecessary to address any of the other factual contentions, because they could not be material in light of the fact that the misuse of the security deposit funds is sufficient to justify a declaration of default of the Regulatory Agreements.

The court concludes that the United States is entitled to judgment on Carrington Gardens' final claim as well. Under *Burgin,* the reasons used by HUD to justify its refusals of Carrington Gardens' financial requests are entitled to deference.[18] Carrington Gardens disputes the facts that HUD advanced in support of these reasons. The court finds as a matter of law that the delinquency of the 241 Loan, the misappropriation of security deposit funds, and Carrington Gardens' failure to maintain sufficient funds in its Replacement Reserve Fund, all clear violations of the Regulatory Agreements, *see* U.S. Ex. 114 (the 236 Regulatory Agreement); U.S. Ex. 168 (the 241 Regulatory Agreement),[19] are sufficient reasons to justify a declaration that Carrington Gardens breached the Regulatory Agreements, and hence to justify a decision to deny a financial request.[20] Thus, to avoid summary judgment, Carrington Gardens must raise a genuine issue of material fact regarding whether HUD's factual determinations in this regard were arbitrary or capricious. As explained above, the statute of limitations has run on any claim involving the loan delinquency, and Carrington Gardens has failed to raise a genuine issue of material fact regarding the misuse of security deposit funds. Additionally, Carrington Gardens does not dispute that it ceased making the required payments to the Replacement Reserve Fund in September 1993, in response to HUD's refusal to grant a disbursement from that fund. Therefore, the court concludes that HUD's determination that Carrington Gardens breached the Regulatory Agreements was not arbitrary and capricious. Accordingly, the United States is entitled to summary judgment on this claim.

### III. Conclusion

For the reasons detailed herein, the court **AFFIRMS** the ruling of the bankruptcy court granting judgment in favor of the United States on all claims. The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Final Order to all counsel of record and to the United States Bankruptcy Court for the Eastern District of Virginia.

It is so **ORDERED.**

**18.** The United States submitted an excerpt from the HUD Handbook as an addendum to its brief. This handbook outlines the factors that go into evaluating a rental increase request and was summarized in the United States' brief. *See Brief of the Appellee/Cross–Appellant,* at 20–22 (Sept. 6, 2000). With regard to requests for disbursements from the Replacement Reserve Fund, it was HUD's policy to deny such requests if a project is in violation of its regulatory agreement. *See* Decl. of Jean Mitrovich, at ¶ 14, *U.S. Statement of Administrative R. & Statement of Ma-*

*terial Facts in Supp. of Mot. for Summ. J.,* Ex. D (submitted to bankruptcy court).

**19.** *See supra* note 16.

**20.** HUD advanced other reasons as well in justification for some of the denials of Carrington Gardens' requests, and Carrington Gardens has offered opposition to the factual underpinnings of some of these. Again, any factual disputes are immaterial, because the findings discussed above are sufficient to justify HUD's actions.